IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

UNITED STATES OF AMERICA          )
                                  )
          v.                      )     1:13cr129 (JCC/IDD)
                                  )
BRITA LANETTE JACKSON,            )
                                  )
          Defendant.              )

**M E M O R A N D U M    O P I N I O N**

This matter is before the Court on Defendant Brita
Lanette Jackson's (hereafter referred to as "Defendant,"
"Defendant Jackson," or "Ms. Jackson") Motion to Suppress [Dkt.
27] (hereafter referred to as the "Motion"). Based upon the
evidence and testimony heard by the Court, for the following
reasons, the Court will deny Defendant's Motion to Suppress.

**I. Background**

**1. Factual Background**

Defendant Brita Lanette Jackson has been charged in a
two-count indictment with making false statements in connection
with the purchase of a firearm, in violation of 18 U.S.C. §
922(a)(6), as well as conspiracy, in violation 18 U.S.C. § 371.
Defendant's Motion to Suppress challenges law enforcement

officers' warrantless entry into a residence located at 822
Butler Avenue on May 24, 2012.[1]

On May 24, 2012, an employee of Virginia Arms, a
licensed federal firearms dealer located in Manassas, Virginia,
contacted the Bureau of Alcohol, Tobacco, Firearms, and
Explosives (hereafter referred to as "the ATF"). The Virginia
Arms employee informed the ATF that a female was attempting to
purchase an AK-47 style assault firearm (hereafter variously
referred to as the "firearm" or the "subject firearm") from the
store. It is undisputed that Defendant was the woman described
by the Virginia Arms employee. The employee stated to the ATF
that while the woman claimed on required paperwork that the
firearm was for her, she could not describe the caliber or basic
characteristics of the firearm she was attempting to purchase
from the store.[2] The Virginia Arms employee believed that she
was purchasing the firearm for another party, a prohibited proxy
transaction often referred to as a "straw purchase" that
constitutes a violation of federal law.[3] The employee also

---

[1] Defendant does not dispute the Government's characterization of the facts
prior to the moment that law enforcement began to follow Mr. McLeod's vehicle
as it exited the Virginia Arms parking lot.

[2] According to the Government, "[w]hen asked by store employees, the female,
who identified herself with a driver's license as defendant Brita Lanette
Jackson, indicated the firearm she was purchasing was a 9mm when it was
actually a 7.62mm weapon." (Gov. Opp'n 2.)

[3] A "straw purchase" of a firearm has been described as a sale where the
individual making the purchase represents himself to be the actual buyer, but
is actually the agent of another person who will receive possession of the
firearm. *See United States v. Nelson*, 221 F.3d 1206, 1208-09 (11th Cir.
2000).

observed that an African-American male appeared to be waiting in a vehicle outside the store. The Virginia Arms employee relayed the license plate number of the vehicle to the ATF.  While waiting for the firearm transaction to proceed, Defendant left the store several times to speak with the individual waiting in the car. The man never entered the store.  According to the Government, the ATF supervisory agent asked the Virginia Arms gun dealer to stall Defendant's purchase while a group of ATF special agents were dispatched to the store. (Gov. Opp'n 2.)

As a consequence of the information provided by the employee, ATF agents subsequently arrived at the store.  The license plate number of the awaiting automobile was run prior to the arrival of law enforcement and revealed Timothy McLeod (hereafter referred to as "McLeod" or "Mr. McLeod") to be the registered owner of the vehicle.  Mr. McLeod was shown to reside in Winchester, Virginia.  ATF agents thereafter obtained a photograph of Mr. McLeod, and also became aware that Mr. McLeod had several felony convictions which disqualified him from purchasing a firearm.  Upon arriving in the Virginia Arms parking lot, ATF agents were able to visually confirm via binoculars that the person in the car was Mr. McLeod and that he was the driver of the vehicle. (*Id*. at 3.)

ATF agents contacted Virginia Arms and instructed store employees to allow Defendant to purchase the firearm and

leave the store. Defendant completed the purchase of the

firearm, a Century Arms International AK Pistol, and was

observed leaving the store with the box. The Government states

that the box that housed the firearm was described to an ATF

agent by a Virginia Arms store employee, and that information

was thereafter relayed via radio to other ATF agents present.

(*Id.*) ATF agents observed Defendant place the boxed firearm

into the backseat of Mr. McLeod's vehicle. The automobile,

carrying both Defendant and Mr. McLeod, then left the parking

lot.[4] The ATF agents covertly followed Mr. McLeod's vehicle.

(*Id.*)

For the purposes of deciding the instant Motion,

Defendant does dispute the Government's characterization of the

facts prior to the moment that law enforcement began to follow

Mr. McLeod's vehicle as it exited the Virginia Arms parking lot.

Consequently, the Court will not engage in a detailed analysis

of those facts within the context of the instant proceeding.

As to the actions that took place thereafter, the

parties dispute the veracity of each other's representations of

---

[4] According to the Government, "[a]gents believed they had enough information to detain [Defendant], but they were interested in establishing McLeod's possession of the firearm since he was a convicted felon" and, as a consequence, law enforcement allowed McLeod's automobile to depart the parking lot. (Gov. Opp'n 3.) Special Agent Grabman testified that ATF agents did not detain Defendant as Mr. McLeod's vehicle left the parking lot because they were "continuing to further our investigation. We knew that she didn't know the make or the model or caliber of the firearm when she said she was a collector, but we didn't know if the firearm was going to be transferred to another person at that point." (Suppression Hearing Tr. ("Tr.") 20:15-21.)

the attendant facts and offer starkly differing characterizations of the events that took place prior to law enforcement's warrantless entry into Mr. McLeod's residence.

On behalf of the Government, the Court heard testimony from Special Agent Jeffery P. Grabman (hereafter referred to as "Special Agent Grabman") and Special Agent Vincent Castro (hereafter referred to as "Special Agent Castro"). Both agents were involved in the related investigation, as well as the events that transpired that day.

Special Agent Grabman, a special agent with the ATF involved in the investigation, initially was involved in surveillance of Mr. McLeod's vehicle on that day. (Tr. 17:25-18:7.) Special Agent Grabman was the first agent to arrive on the scene in the Virginia Arms parking lot. (Tr. 18:12-13.) After leaving the Virginia Arms parking lot, Mr. McLeod's vehicle travelled westbound on Interstate 66, where Special Agent Grabman continued his surveillance of the vehicle. (Tr. 20:22-21:2.) According to Special Agent Grabman, approximately five law enforcement vehicles were involved in surreptitious observation. (Tr. 18:4-7.) Special Agent Castro, an ATF special agent involved in the investigation, also was among those members of law enforcement involved in surveillance. (Tr. 51:20-22.) Special Agents Grabman and Castro testified that although law enforcement had initially been unsure of the

destination of Mr. McLeod's vehicle as it left the Virginia Arms parking lot, they assumed that it would travel to Mr. McLeod's Winchester, Virginia residence once the vehicle began to travel on Interstate 66 westbound. (Tr. 20:22-21:2; 53:17-18.)

According to the Government, an "agent called ahead to involve Western District of Virginia ATF agents and a Winchester-area regional drug task force." (Gov. Opp'n 2.) Special Agent Castro testified that he was present as a passenger in the vehicle of Agent Don Dockendoff (hereafter referred to as "Agent Dockendoff") when Agent Dockendoff contacted local ATF officials in Winchester, who relayed to Agent Dockendoff information about Mr. McLeod and the residence that was derived from local ATF and other law enforcement in the Winchester area. (Tr. 52:3-7.) Through this communication with local authorities, ATF agents learned that Mr. McLeod was known as a drug dealer to local law enforcement and that a controlled hand-to-hand purchase of crack cocaine had recently been made from Mr. McLeod's residence. (Gov Opp'n 2-3; Tr. 52:11-20.) Special Agent Grabman testified that he knew at the time that Mr. McLeod was a five-time convicted felon, although he did not know the nature or details of the underlying offenses. (Tr. 18:19-23; 38:13-17.) Special Agent Castro similarly testified to knowledge of the number of Mr. McLeod's felony convictions but not the nature of the underlying offenses. (Tr. 66:4-20.)

As to Mr. McLeod's Winchester residence, located at 822 Butler Avenue, Special Agent Grabman testified that he also was aware that local police had recently made a crack cocaine purchase from Mr. McLeod there. (Tr. 19:24-20:7.)

Regarding Defendant's record, Special Agent Grabman testified that he was aware that Defendant had passed the criminal background check to purchase the subject firearm, though he was not aware of any specific charges on her record.[5] (Tr. 38:18-39:7.) Special Agent Castro testified that he also was aware that Defendant did not have a criminal history that would prevent her from purchasing the subject firearm. (Tr. 66:21-24.)

Special Agent Grabman testified that, as law enforcement followed Mr. McLeod's car along Interstate 66, they were aware that the subject firearm remained in the rear passenger seat of the vehicle where they had observed Defendant place it after exiting the gun store. (Tr. 20:8-12.) Regarding the subject firearm, Special Agent Grabman testified that he believed it was a very dangerous weapon that has been "made for war and meant to kill a person" and could fire high-velocity ammunition capable of piercing windows, doors, and the bulletproof vests worn by the agents on that day. (Tr. 19:7-18.)

---

[5] Special Agent Grabman testified that though passing the background check indicated that Defendant had no felony convictions, it little bespoke the nature of her record as to arrests or other charges. (Tr. 38:23-25.)

Special Agent Castro also testified that law enforcement was concerned about the nature of the firearm, describing the weapon as "very dangerous" and noted in his testimony that the caliber of the ammunition was a significant consideration. (Tr. 54:6-7.) Similarly to Special Agent Grabman's perception of the subject firearm, Special Agent Castro also testified that he believed that "the bullets that fire from that weapon can go through our ballistic vest." (Tr. 60:20-24.)

Special Agents Grabman and Castro testified that ATF agents arrived at 822 Butler Avenue, *i.e.*, Mr. McLeod's residence, prior to the arrival of the vehicle carrying Mr. McLeod and Defendant. (Tr. 22:6-11; 54:21-55-1.) Special Agent Grabman parked his vehicle on the street in front of the house.[6] (Tr. 26:19-24.) Special Agent Castro testified that his vehicle was right behind Special Agent Grabman's vehicle, located to the right of and one house down from 822 Butler Avenue. (Tr. 55:2-9.) Special Agent Castro also testified that he was to the right of the front door, which he could see, although he could not see the side door. He stated that he was able to see the passenger side of Mr. McLeod's vehicle. (Tr. 56:2-11.)

According to Special Agent Grabman's testimony, he was unsure at that moment of whether any other individuals or

---

[6] According to Special Agent Grabman, he was driving a black, four-door Infinity. The vehicle has "blue and red lights in the grille, wig-wag headlights and a siren." (Tr. 27:2-3.)

additional firearms then were present in Mr. McLeod's residence. (Tr. 26:6-10.) Special Agent Castro also stated in his testimony that law enforcement officers were unsure as to the quantity or identities of any additional occupants of the residence. (Tr. 54:7-14.)

Special Agent Castro also testified that the circumstances initially concerned law enforcement with regard to officer safety, specifically noting the nature of the subject weapon, the recent drug trafficking that had occurred at the location, and the fact that they were located at the residence of a multiple convicted felon. (Tr. 53:23-54:5.) According to the Government, because Mr. McLeod was a convicted felon, and having considered "the presence of a powerful 7.62mm firearm, and information indicating McLeod's residence was linked to illegal drug distribution, the ATF agents determined it was too dangerous to allow the firearm to enter the house." (Gov. Opp'n 3.) Consequently, ATF agents decided they therefore would identify themselves and perform an investigative stop in time to prevent the firearm from moving to a different location, such as entering the house or entering into the possession of another individual. (Tr. 23:4-8; 53:18-21.) Special Agent Castro

broadcasted this plan over to radio to all agents and officers involved in the surveillance.[7] (Tr. 54:15-18.)

Upon the arrival of Mr. McLeod's vehicle at 822 Butler Avenue, Special Agent Grabman testified that Mr. McLeod exited the driver's seat and Defendant exited the passenger's seat. Both individuals entered the house without the box containing the subject firearm. (Tr. 24:20-25:2.) Special Agent Castro offered similar testimony, stating that neither Defendant nor Mr. McLeod were in possession of the boxed firearm upon their initial entry into the residence. (Tr. 56:12-23.) ATF agents, then the only law enforcement officers present at the scene, did not make any movement to detain Defendant or Mr. McLeod at that point. (Tr. 25:3-13; 56:24-57:2.)

Both Special Agents Grabman and Castro testified that, after approximately five minutes, Defendant emerged from the residence and went to the rear passenger's seat of Mr. McLeod's vehicle to retrieve the boxed firearm. (Tr. 25:20-26:5; 57:3-18.) Special Agent Grabman testified that he and Special Agent Castro conveyed Defendant's actions over the radio. (Tr. 26:13-15.) Special Agent Grabman testified that, as Defendant removed the boxed firearm from the vehicle, he called out over the radio for agents to make movements to stop Defendant at that point.

---

[7] According to Special Agent Castro, his "immediate supervisor" placed him in charge of the manner in which the investigation would proceed upon arrival at 822 Butler Avenue. (Tr. 53:2-10.)

(Tr. 26:14-15.)  Special Agent Castro testified that he also
called for the initiation of an investigative stop at that
point.  (Tr. 57:19-21.)

        According to the Government, before Defendant was able
to return to the residence, the ATF agents activated the lights
and sirens on their vehicles and drove towards the front of Mr.
McLeod's residence. "The agents, who wore body armor marked with
'Police" and "ATF,' and who had badges displayed, drew their
weapons and identified themselves as federal agents to the
[D]efendant." (Gov. Opp'n 4.)  Special Agent Grabman testified
that, after activating the lights and siren on his vehicle, he
arrived in front of the residence and exited his vehicle with
his weapon drawn.  He testified that he was dressed in a vest
and wore a law enforcement badge as he approached Defendant.
(Tr. 26:16-18; 27:4-12.)  Other agents followed behind him. (Tr.
28:4-10; 58:12-13.)  Special Agent Castro testified that, as to
his own attire, he was wearing an ATF-issued ballistic vest that
read "ATF" and "Police" on the front.  He was also wearing his
badge.  He testified that his weapon was drawn, though it was
pointed towards the ground as he approached the front of the
house.  (Tr. 58:6-11.)  As to the position and attire of Agent
Dockendorff, Special Agent Castro testified that he assumes he
was behind him, dressed in a similar ATF-issued ballistic vest,
although he was focused immediately on identifying any possible

threats from the front of the house rather than the presence of other agents. (Tr. 58:24-59:8.)

Special Agent Grabman testified that Defendant was moving in the direction of the side door of Mr. McLeod's residence when he called out his identification as police and told her to stop. According to Special Agent Grabman, Defendant ignored his command to stop and continued to move towards the side door of the house. Special Agent Grabman testified that he was unable to reach her before she entered the residence and thereafter locked the door behind her. (Tr. 27:13-19; 28:19-20.) Special Agent Castro testified that Special Agent Grabman reported to him that Defendant "ran into the house." (Tr. 59:23-25.) Upon reaching the side door, Special Agent Grabman testified that he found the entrance to be closed and locked. He began banging on the door and continued to identify himself as police. He testified that no one came to the door despite his shouts. According to Special Agent Grabman, there was a curtain covering the window on the door, obscuring the ability of law enforcement agents to see inside the residence. (Tr. 28:25-29:7.) Special Agent Castro offered similar testimony, stating that no one appeared at the door despite the hard knocks and announcements of officers. (Tr. 60:1-4.) He also corroborated the fact that law enforcement was unable to see the inside of the residence through the door's glass window due to

the existence of a curtain in front of the door's window. (Tr. 61:6-11.)

ATF agents then believed that they were then confronted with a serious threat to officer safety, as Defendant had ignored law enforcement and retreated into Mr. McLeod's residence while in possession of an assault-style firearm that she had purchased. (Tr. 60:17-61:3.) Special Agent Grabman testified that, at that point, the agents felt compelled for officer safety reasons to ensure that the "weapon wasn't used against [law enforcement] and loaded." According to Special Agent Grabman, law enforcement based this decision upon the attendant circumstances. Defendant had retreated into the residence in possession of a powerful firearm capable of firing 7.62mm ammunition at a rapid rate. Though Defendant had not purchased ammunition in the same transaction as the firearm purchase, Special Agent Grabman testified that law enforcement was unsure as to whether there was ammunition within the residence already. Special Agent Grabman also testified that law enforcement was concerned with the rapidity with which this model of firearm could be loaded, as the subject firearm utilized a clip-fed ammunition system. (Tr. 19:7-18; 29:7-30:9.) According to Special Agent Grabman, the fact that no one appeared at the door upon command suggested to him that the individuals inside were not being cooperative and made him

unsure of what law enforcement would face from inside the residence, reinforcing his belief that officer safety necessitated securing the subject firearm to ensure that it was not used against law enforcement. (Tr. 30:22-31:3.)

In addition to his concerns regarding the dangerous nature of the weapon, the fact that the occupant of the residence was a convicted felon concerned Special Agent Castro, as did the recent drug trafficking that recently had occurred from the residence. (Tr. 60:24-61:3.) Special Agent Castro also testified that he considered Defendant's retreat into the residence to be a threat to officer safety. (Tr. 65:23-66:3.) As a consequence of these considerations, ATF agents determined that they needed to enter the house immediately to secure the firearm. (Gov. Opp'n 4.)

After law enforcement determined that it was necessary to enter into Mr. McLeod's residence, Special Agent Grabman unsuccessfully attempted to kick the door open. (Tr. 30:10-13; 61:12-14.) Special Agent Castro then used an expandable baton to break the corner of the window, and Special Agent Grabman reached his hand inside the residence and unlocked the door. (Tr. 30:13-16; 61:15-17.) Special Agent Grabman testified that during this process members of law enforcement were continually shouting for Defendant and Mr. McLeod to open the door. (Tr. 30:17-21.)

Special Agent Grabman stated that he was the first
officer to enter the residence. (Tr. 33:5-6.) Special Agent
Castro stated that he was the second officer to enter. (Tr.
63:23-25.) Upon entering the residence, agents found it to be
divided into two levels and they were entering the lower level.
Despite their repeated yelling and identification, no one
appeared to be present in the lower level of the residence. (Tr.
31:18-22.) Special Agent Grabman testified that as agents
approached the stairs leading to the upper level of the
residence, Mr. McLeod began to descend the stairs with a pit
bull canine, causing the parties to become "stuck on the stairs
with the dog and Mr. McLeod." (Tr. 31:23-32:1.) Mr. McLeod
would not comply with being "brought down to the ground" and
agents forced him to the ground, while Special Agent Grabman
kept his gun trained on the pit bull. (Tr. 32:2-7.) Defendant
was located in an upstairs bedroom. (Tr. 62:14-63:5.) Upon
encountering Defendant in the residence, Special Agent Grabman
testified that she was uncooperative. (Tr. 32:8-9.) Special
Agent Castro testified that it took several minutes for
Defendant to obey their instructions and step out of the
bedroom. (Tr. 62:19-21.) Defendant was eventually handcuffed and
detained. (Tr. 32:17-19.)

Law enforcement subsequently performed a protective
sweep of the residence. (Tr. 35:1-12; 63:6-12.) During the

protective sweep, law enforcement identified several items in plain view that later were seized upon issuance of a warrant. (Tr. 39:8-13.) The box containing the subject firearm was among the items located in plain view, having been observed in the utility room inside the door through which law enforcement made entry. (Gov. Opp'n 5; Tr. 39:14-18.) The boxed firearm remained there until a search was later conducted. (Tr. 38:17-18.) Ms. Diamond Roberts and Mr. Daevon Roberts, as well as one other member of Mr. McLeod's family, were located in the area of the back deck on the premises. (Tr. 36:23-37:8; 93:6-94:23; 117:17-118:10.)

Upon completion of the protective sweep, law enforcement awaited the issuance of a search warrant by a local magistrate before performing any further search. (Gov. Opp'n 5; Tr. 60:13-17.) Lt. Wallace Stotlemyer (hereafter referred to as "Lt. Stotlemyer"), a lieutenant with the City of Winchester Police Department, responded to assist ATF agents on the scene with preparing and obtaining a search warrant. (Tr. 70:20-71:16.) He swore out and submitted the search warrant application to Frederick County Circuit Court. (Tr. 71:17-23.)

The Government states that, while awaiting the issuance of the search warrant from a local magistrate, ATF agents based in Falls Church, Virginia initiated interviews with Defendant and Mr. McLeod. (Gov. Opp'n 5.) According to Special

Agent Grabman, the agents did not search Mr. McLeod's residence
immediately after law enforcement detained Defendant and Mr.
McLeod, as the agents were focused upon conducting interviews.
Prior to obtaining a search warrant, the two individuals were
separated and apprised of their *Miranda* rights, and thereafter
law enforcement attempted to talk to them.[8]  (Tr. 32:25-33:4.)
Special Agent Grabman testified that, after securing the
residence and other individuals present at the residence,
Special Agent Grabman removed Defendant's handcuffs.  Special
Agent Grabman "gave his *Miranda* card to [Special] Agent
[Shannyn] Gardner, who then read Defendant her *Miranda*
warnings."  (Tr. 33:10-15.)  According to Special Agent Grabman,
Defendant verbally waived her *Miranda* rights "immediately,"
although she initially was unsure of what to say to law
enforcement. (Tr. 33:16-24.)  Special Agent Grabman testified
that Defendant asked him if she needed an attorney, to which
Special Agent Grabman replied that he could not advise her as to
whether she should have an attorney or not but that she was free
to "stop the questioning at any time and talk to an attorney if
[Defendant was] not comfortable."  (Tr. 33:24-34:4.)  Special
Agent Grabman stated that she became more forthcoming, and that
her interview lasted over an hour.[9]  (Tr. 34:5-14.)  Defendant

---

[8] The Court notes that Defendant does not challenge the provision and waiver
of *Miranda* rights.
[9] Mr. McLeod also was interviewed by law enforcement. (Tr.34:15-16.)

was not arrested and was released subsequent to the completion of the interview.[10]  (Tr. 35:13-16.)

A warrant was later obtained for Mr. McLeod's residence.  (Tr. 33:7-9.) The Government states that after a search warrant was obtained, "additional firearms, paperwork related to firearms purchases, and ammunition [were] located in the residence by law enforcement officers."  Drug paraphernalia was also found.  (Gov. Opp'n 5; Tr. 36:17-22.)  A loaded SKS magazine, capable of use in the subject firearm, was found later in Mr. McLeod's residence.  (Tr. 151:8-21.)  According to Special Agent Grabman, he was not involved in the later search of the residence, as it was performed primarily by local police. (Tr. 34:17-25.)

Defendant argues, as to the factual circumstances of the case, that what transpired subsequent to ATF agents arriving at Mr. McLeod's residence has been described variously by law enforcement in "contradictory" terms.  (Def. Mot. 1.) Specifically, Defendant contends that "[t]here are four different versions, according to law enforcement, of what happened next..." (*Id*. at 2.)  The four versions, as described by Defendant, represent disparate factual descriptions of the events of that day.  Defendant's "Version 3" represents the

---

[10] Mr. McLeod, however, was arrested on state charges.  (Tr. 35:17-23.)

conception of the day's events which Defendant believes

represents the truth of what took place:

> Version 3: In an undated ATF Report of
> Investigation, ATF Agent Shannyn Gardner
> stated that McLeod and Jackson first went
> into the residence through a side door,
> without bringing the box obtained from
> Virginia Arms. Subsequently, Agent Gardner
> reported that "Jackson immediately came back
> to the car and retrieved the box containing
> the firearm and went back towards the house.
> At this time, Agents pulled up and
> approached the side door of the residence.
> Agents announced their presence and
> attempted to get someone to come to the
> door. The door was locked and no one would
> answer and agents forcibly entered the
> residence."

(Def. Mot. 3.)  Defendant contends that the alleged

inconsistencies said to have been espoused by law enforcement in

describing the events of that day suggest that "Version 3"

represents the most likely manner in which the events of that

day took place.  Defendant argues that Mr. McLeod and Defendant

returned to the residence and entered through a side door.

Thereafter, Defendant then went to the vehicle, retrieved the

box, and went back inside the residence.  (*Id*.)  Defendant

testified that she then placed the firearm box in the "laundry

room" and proceeded upstairs. (Tr. 137:18-22.)  Defendant

testified that law enforcement neither approached her nor

attempted to stop her, nor did she observe any law enforcement

activity while retrieving the firearm from Mr. McLeod's vehicle.

(Tr. 137:1-17.) According to Defendant, "[l]ater, law enforcement knocked on the door, announced their presence, and tried to get someone inside the house to let them in." (*Id.*) Defendant contends that when no one came to the door, agents broke the pane of glass on the door, unlocked the deadbolt, and unlocked the house. "Defendant believes that the evidence will also establish that, while the agents were trying to get someone to come to the door, they engaged in conversation with a person in the backyard, and asked (unsuccessfully) for that person to let them in." (*Id.*)

Defendant states that seven to ten agents then forcibly entered the residence and detained all of its occupants. (*Id.* at 4-5.) Defendant was detained upstairs. According to Defendant, the subject firearm from Virginia Arms was found in the basement, still in its box. Prior to having requested a search warrant for the residence, agents interrogated both Defendant and Mr. McLeod, with Mr. McLeod's interrogation occurring outside and Defendant's interrogation occurring within the home.[11] (*Id.* at 5.) According to Defendant, interrogation began at 3:15 PM. Subsequently, Lt. Stotlemyer applied for a search warrant for the residence at 3:45 PM. (*Id.*) Defendant recites the probable cause statement on the search warrant application, which reads in its entirety:

---

[11] Defendant believes that the Government will seek to admit as evidence at trial several of the statements she made during this interrogation.

On 5/24/12, a representative of VA Arms
contacted agents with the ATF and advised
that Brita Lannette Jackson was in the
firearms store and was "straw purchasing" an
assault style weapon. The ATF agents then
conducted surveillance of Jackson and the
vehicle Jackson was riding in. The suspect
vehicle was driven by Timothy McLeod who is
a convicted felon. The suspected vehicle
returned to [address redacted] @ which time
agents attempted to approach McLeod who then
fled into the residence. Agents pursued
McLeod into the residence where an assault
style weapon was sitting on the floor in the
basement. The weapon's box is the same box
observed during the "straw purchase."

(*Id.*)  At 3:58 PM, the requested search warrant was issued by

the local magistrate and executed shortly thereafter.[12] (*Id.*)

## 2. <u>Procedural Background</u>

Defendant filed the instant Motion to Suppress on May

3, 2013.  On May 9, 2013, the Government filed an Opposition to

Defendant's Motion to Suppress. [Dkt. 28.]  Defendant filed a

Reply in Support of their Motion on May 14, 2013. [Dkt. 31.]  An

evidentiary hearing as to Defendant's Motion to Suppress was

held on May 16, 2013.  An additional hearing as to the Motion

was held on May 23, 2013.

During the initial hearing upon Defendant's Motion,

the Court heard testimony from several witnesses.  The Court

heard testimony on behalf of the Government from Special Agent

Grabman and Special Agent Castro. On behalf of Defendant, the

---

[12] Defendant believes that, during the search, "agents seized a number of
items that the government will seek to admit in evidence at trial." (*Id.*)

Court heard testimony from Special Agent Shannyn Gardner (hereafter referred to as "Special Agent Gardner"). The Court also heard testimony from Lt. Wallace Stotlemyer, Ms. Diamond L. Roberts, Mr. Daevon Roberts, and Defendant herself. The Court also accepted the stipulated testimony of Ms. Martha Payne, a neighbor of Mr. McLeod, at the second hearing upon Defendant's Motion. Ms. Payne was not present at either hearing. In addition, the Court heard the testimony of Pascual Velarde, an investigator with the Federal Public Defender for the Eastern District of Virginia, at the second hearing upon Defendant's Motion.

## II. Applicable Law

The Fourth Amendment provides that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. Amend. IV. While the Fourth Amendment protects the individual's privacy in a variety of settings, nowhere "is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home." *Payton v. New York*, 445 U.S. 573, 589-90 (1980). Indeed, it is widely recognized that physical entry of the home is "the chief evil" against which the protections of the Fourth Amendment apply. *United States v. United States Dist. Ct.*, 407 U.S. 297, 313 (1972). Because of this heightened

privacy interest, warrantless entry into an individual's home is presumptively unreasonable. *See Payton*, 445 U.S. at 586.

Warrantless entry of a home may be, however, constitutionally permissible if the intrusion falls within one of the carefully defined exceptions to the warrant requirement. *See United States v. Cephas*, 254 F.3d 488, 494 (4th Cir. 2001). Among the recognized exceptions to the general warrant requirement is the existence of exigent circumstances. Exigent circumstances arise where "law enforcement officers confront a compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." *United States v. Wiggins*, 192 F.Supp.2d 493, 498 (E.D.Va. 2002)(quoting *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir. 1995)). A judicially recognized exigency justifying warrantless entry occurs when the delay in obtaining a warrant poses a threat to the safety of police officers or of the general public. *See Wiggins*, 192 F.Supp.2d at 501. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." *Warden v. Hayden*, 387 U.S. 294, 298-99 (1967).

The existence of exigent circumstances must be determined as of the moment of the warrantless entry of the officers onto the premises. *See Reed*, 935 F.2d at 643 (citing *Arkansas v. Sanders*, 442 U.S. 753, 763 (1979)). To successfully

sustain the exigent circumstances doctrine, police officers need possess only a "reasonable suspicion" that such circumstances exist at the time of the search or seizure in question. *United States v. Schaffer*, 286 F. App'x 81, 84 (4th Cir. 2008). Because the existence of exigent circumstances depends, in essence, on an evaluation of the reasonableness of the officers' actions, the test evades precise formulation. *See O'Connor v. Ortega*, 480 U.S. 709, 731 (1987)(Scalia, J., concurring). Rather, the presence or absence of emergency circumstances will vary from case to case depending on the inherent necessities presented by the facts of each. *See Reed*, 935 F.2d at 642. Courts should consider "[t]he appearance of the scene of the search in the circumstances presented as it would appear to reasonable and prudent men standing in the shoes of the officers." *United States v. Wysocki*, 457 F.2d 1155, 1160 (5th Cir.), *cert. denied*, 409 U.S. 859 (1972); *see also United States v. Socey*, 846 F.2d 1439, 1446 (D.C.Cir.*), cert. denied*, 488 U.S. 858 (1988).

### III. Analysis

1. **Law Enforcement's Warrantless Entry into Mr. McLeod's Residence**

   a. **Factual Disagreements**

   The Court finds that the ATF agents are credible as to the circumstances surrounding the agents' entry into Mr.

McLeod's residence and detention of Defendant.  The Court has
made this determination based on both the record and the
testimony of witnesses at hearing. The Court acknowledges that
the testimony of the agents entailed certain inconsistencies.
The Court notes that particular discrepancies as to the facts
have been observed in the search warrant application that was
completed by Lt. Stotlemyer.  The Court also finds, based upon
the testimony of Ms. Diamond Robert, Mr. Daevon Roberts, as well
as the stipulated testimony of Ms. Martha Payne, that no sirens
were activated on law enforcement vehicles. (Tr. 93:15-16;
126:10-11.)  Nevertheless, the Court does not believe that there
existed inconsistencies significant enough to undermine the
credibility of the agents' testimony at hearing regarding their
descriptions of the day's events.

As to the report upon which Defendant relies in
espousing her "Version 3" conception of the day's events, this
Court is satisfied that Special Agent Gardner's testimony
adequately and credibly explains the incompleteness of that
initial report.  The Court notes that Special Agent Gardner is
the author of the subject report. (Tr. 81:21-23.)  In describing
the report at hearing, Special Agent Gardner assessed the
accuracy and completeness of the report as "incomplete."  (Tr.
90:12-15.)  The Court also notes that Special Agent Gardner's
sworn Affidavit in Support of Criminal Complaint and Arrest

Warrant [Dkt. 5] supports the Government's version of the events that took place on that day. The Court believes that the incomplete report does not necessarily espouse a conflicting version of the day's events, but rather presents an incomplete account of the details surrounding agents' entry into Mr. McLeod's residence. The Court ascribes more credence to the oral testimony of the ATF agents.

As to Defendant's description of the events and accompanying equivocal testimony, the Court does not find Defendant to have been credible in her account of the circumstances of law enforcement's entry.

### b. **Exigent Circumstances**

The Government has argued that "law enforcement officers' warrantless entry into Defendant's home was necessary to protect officer safety, supported by probable cause, and in compliance with clearly established exceptions to the warrant requirement." (Gov. Opp'n 1.) Indeed, the Government argues that the officer safety doctrine justified law enforcement's entry into Mr. McLeod's residence. Regarding the Government's argument as to the officer safety doctrine, they argue that the confluence of factual circumstances after Defendant fled into Mr. McLeod's residence constituted a situation presented an impermissible threat to officer safety.

> After the defendant slammed the door and
> locked it, the ATF agents in this case found
> themselves sitting outside a drug-involved
> residence which contained at least one
> assault-style firearm, the defendant, who
> had already refused to cooperate with them,
> and a convicted felon that they suspected
> was involved in the purchase of the firearm.

(*Id.* at 7.)  The Government argues that the scenario left
officers "vulnerable" and "proverbial sitting ducks" if they
were to wait until a warrant was obtained. (*Id.*)  As a
consequence of the aforementioned factual posture, "[t]he agents
reasonably believed their safety required them to enter the
house and secure the occupants." (*Id.*)  The Government argues
that "[u]nder the totality of the circumstances, a reasonable
law enforcement officer could have concluded, as these agents
did, that entering the house was required to protect officer
safety." (*Id.*)  Addressing law enforcement's reason for not
arresting Defendant in the parking lot of Virginia Arms, the
Government argues that the delay was due to the "legitimate
investigative purpose of attempting to catch McLeod in
possession of the firearm. McLeod was the true target of ATF
which is why agents did not arrest the defendant following her
confession but did arrest McLeod." (*Id.* at 7 n. 3.)

Although Defendant does not dispute that law
enforcement had probable cause to arrest her after she had made
the purchase of the subject firearm, she argues that exigent

circumstances sufficient to justify the warrantless entry into Mr. McLeod's residence did not exist in this case. (Def. Mot. 10.) Defendant argues that as law enforcement decided not to arrest Defendant in the parking lot of Virginia Arms, and thereafter surreptitiously follow Mr. McLeod's vehicle to his Winchester, Virginia residence, "at least an hour elapsed between the time the agents decided to search Ms. Jackson's residence and the time of their entry." (*Id.*) Defendant argues that this constitutes more than a sufficient period of time in which to obtain a warrant for Mr. McLeod's residence. Defendant further contends that law enforcement chose not to arrest Ms. Jackson after she had completed the "straw purchase" at Virginia Arms because they did not wish to undertake the process of obtaining a warrant. "Accordingly, they deliberately attempted a warrantless arrest the moment Mr. Jackson reached the threshold of her home." (*Id.* at 10-11.)

The Court believes that there is little doubt that the law enforcement officers had an objectively reasonable belief that their own safety could be jeopardized by a delay in entering the residence. The record adequately demonstrates that Defendant withdrew into the residence of a convicted felon while in possession of an AK-47 style semi-automatic assault firearm that fires powerful 7.62mm ammunition. The Court believes that

the subject weapon itself presented a very high degree of danger to law enforcement.

Indeed, examining the conditions faced by the agents, the Court believes that the confluence of circumstances provided law enforcement with justifiable reasons to fear for officer safety. Despite Defendant's factual protestations, she is unable to escape the fundamental fact that Defendant disregarded law enforcement while in possession of an exceedingly dangerous firearm, withdrawing into the residence and locking the door behind her to prevent the entry of agents. The Court notes that the residence was that of a convicted felon, and the recent location of trafficking in crack cocaine. Despite having made their presence known, the agents received no response from the confirmed occupants within. Furthermore, the agents were unable to see into the residence in order to ascertain the danger they faced from within.

Standing outside of Mr. McLeod's residence and uncertain about how many individuals were present within, the agents in this case were faced with an inherently dangerous assault weapon that could have been removed, hidden, or possibly loaded and used against them from a concealed position. The Court also notes that a loaded SKS magazine was, in fact, found within the residence, further validating the agents' concerns that they weapon then was capable of use against law

enforcement. (Tr. 151:8-21.)  Viewing the situation in its totality, the agents could have reasonably found exigent circumstances justifying their warrantless entry at the time agents entered the residence. *See Reed*, 935 F.2d at 643 (per curiam)(holding that presence of guns within a residence, because of the inherent danger involved, justifies "searches and seizures on the basis of exigent circumstances"); *United States v. Rodgers*, 924 F.2d 219, 222-23 (11th Cir. 1991)(finding that exigent circumstances arose when police saw lying on a couch two handguns that suspect, a convicted felon, was not allowed to possess); *Cephas*, 254 F.3d at 495 ("the possibility of danger to police guarding the site" as a factor to be considered in analyzing the question of exigent circumstances").

To the extent that Defendant argues that the exigency was created by law enforcement, the Supreme Court has rejected the "police created exigency" doctrine previously developed by lower courts, stating that "the exigent circumstances rule justifies a warrantless search when the conduct of the police preceding the exigency is reasonable in the same sense." *Kentucky v. King*, 131 S. Ct. 1849, 1858 (2011).  Indeed, the Supreme Court has held that it is immaterial whether law enforcement created the exigency upon which they rely to justify a warrantless search so long as they "did not create the

exigency by engaging or threatening to engage in conduct that violates the Fourth Amendment." *Id*.

Given the need for police to make complicated judgments in what frequently is a very short period of time, the exigent circumstances doctrine requires courts to give some deference to the decisions of trained law enforcement officers in the field and thereby to avoid "'unreasonable second-guessing' of the officers' assessment of the circumstances that they faced." *Figg v. Schroeder*, 312 F.3d 625, 639 (4th Cir. 2002)(quoting *United States v. Montoya de Hernandez*, 473 U.S. 531 (1985)).  In light of the factual circumstances, the Court finds that exigent circumstances justified law enforcement's forcible entry into Mr. McLeod's residence and that no Fourth Amendment violation occurred as to their entry.[13]

### 2. Suppression of Defendant's Interview Statements

Defendant argues that the substance of the Ms. Jackson's interview with law enforcement should be suppressed as "fruit of the poisonous tree."  Relying on their foregoing argument that agents' entry into Mr. McLeod's residence was unlawful, Defendant argues that Ms. Jackson's statements to law enforcement subsequent to their forcible entry should be

---

[13] As the Court has found that exigent circumstances existed under the officer safety doctrine, the Court need not reach the Government's argument as to "hot pursuit."

suppressed as they are "a direct result of the warrantless entry into her home."[14] (Def. Mot. 15.)

In general, the exclusionary rule prohibits the admission of testimonial evidence gathered illegally. *See Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Courts will also suppress evidence that is the indirect product of the illegal police activity as "fruit of the poisonous tree." *Id.* at 488. The critical inquiry is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.*

As the Court has found in its foregoing analysis, law enforcement's entry in Mr. McLeod's residence was lawful, having been justified by exigent circumstances, and no Fourth Amendment violation occurred. Consequently, there is no illegality upon which to establish that Ms. Jackson's statements constitute "fruit of the poisonous tree." The Court therefore will reject Defendant's argument that Ms. Jackson's interview statements should be suppressed as "fruit of the poisonous tree."

### 3. **Suppression of Items Discovered Prior to the Issuance of a Search Warrant**

---

[14] The Court notes that Defendant has not made any argument as to the validity of Defendant's waiver of their *Miranda* rights.

Defendant argues that those items found in "plain view" by agents subsequent to the forcible entry into Mr. McLeod's residence, but prior to law enforcement having obtained a search warrant, should be suppressed as having been obtained in violation of the Fourth Amendment. Defendant contends that "[b]ecause the officers' entry to Ms. Jackson's home was unlawful, they were not lawfully present when they observed and seized items within the home prior to obtaining a search warrant." (Def. Mot. 16.)

The Supreme Court case of *Maryland v. Buie*, 494 U.S. 325 (1990), held that under certain circumstances a protective sweep does not violate the Fourth Amendment. A protective sweep "is a quick and limited search of a premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id*.

The discovery of incriminating evidence in plain view does not constitute a search under the Fourth Amendment. *See Horton v. California*, 496 U.S. 128, 136–37 (1990). "[T]he plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent." *United States*

*v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997)(citing *Horton*, 496 U.S. at 136–37).

The Court has established in its foregoing analysis that law enforcement was "lawfully in a place from which the object may be plainly viewed" and that no Fourth Amendment violation occurred. The Court also notes that the testimony at hearing suggests that the items identified in plain view were not actually seized until after a search warrant was obtained. (Tr. 36:9-22; 39:11-13.) Nevertheless, the Court has found that law enforcement's entry into Mr. McLeod's residence was not unlawful. This state of affairs fatally undermines Defendant's argument, and the Court therefore will reject Defendant's position as to suppression of the items discovered prior to the issuance of the search warrant.

**4. Suppression of Items Discovered Subsequent to the Issuance of a Search Warrant**

Defendant argues that, in this case, the "warrant application is based on an illegal predicate search, the exclusionary rule applies and requires suppression of evidence found pursuant to the warrant as a fruit of the original Fourth Amendment violation." (Def. Mot. 16.) In essence, Defendant contends that in the absence of material gathered through the search, specifically the discovery of the subject firearm itself, the warrant application comprised the impressions

private citizen, an employee of Virginia Arms, "without stating the underlying facts from which a neutral magistrate could have independently determined if there was probable cause to believe that a "straw purchase" had occurred." (*Id.*)

The Court need not address the breadth of Defendant's argument as to this issue, having already determined that law enforcement's entry into Mr. McLeod's residence was lawful. Consequently, the warrant application was not based upon an illegal predicate search. Hypothesizing as to what the complexion of the warrant application would have been in the absence of the information derived from law enforcement's entry is immaterial, as that information was properly included in the warrant application as a consequence of the entry having been lawful and justified by exigent circumstances. The Court's affirmance that law enforcement's entry into Mr. McLeod's residence was lawful wholly defeats Defendant's argument in favor of suppressing the items discovered subsequent to the issuance of the search warrant. The Court will therefore reject Defendant's efforts to suppress that material, based in large part on its foregoing analysis that no Fourth Amendment violation occurred with regard to the agents' entry into the residence.

## IV. Conclusion

For the foregoing reasons, Defendant's Motion to

Suppress is denied.

An appropriate Order will issue.

|  | /s/ |
| --- | --- |
| June 11, 2013 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |
